## MEEKER v. C. R. REMINGTON & SON CO.

(Supreme Court, Appellate Division, Fourth Department. July 24, 1900.)

MASTER AND SERVANT—CO-SERVANTS—MATTER OF LAW—SUBMISSION TO JURY—INSTRUCTIONS.

Plaintiff's intestate, a timekeeper at defendant's paper mill, was killed by the bursting of a tee in a steam pipe, occasioned by the action of the superintendent of the mill in opening a valve while testing some new steam pipes. The superintendent was a millwright, and had general charge of defendant's machinery. *Held*, that the act of the superintendent in opening the valve was the act of a co-servant, and not of the defendant, and the jury should have been so instructed, as a matter of law.

Spring, J., dissenting.

Appeal from trial term, Jefferson county.

Action by Laura H. Meeker against the C. R. Remington & Son Company. From a judgment in favor of plaintiff, and an order denying a new trial, defendant appeals. Reversed.

The action was brought to recover damages for the death of plaintiff's intestate. Defendant is a domestic corporation engaged in the manufacture of paper and wood pulp at Glenpark. For several years prior to December 7, 1898, it had carried on business at that place, and in the month of May preceding it commenced to enlarge its mill by altering its plant and placing in use an additional 20-ton paper machine. During the progress of this work the mill continued in operation. The work was nearly completed at the time of the accident, but the additional machine had not been operated. Plaintiff's intestate was employed as timekeeper. The work of enlarging the plant was done by the employés of defendant, under the supervision of a competent and experienced superintendent, who was, and had been for a long time, superintendent of its works. A new engine had been erected, and wrought-iron steam pipes, from eight to ten inches in diameter, had been placed in position, connecting the new engine room with the boilers, which were more than 100 feet distant therefrom. A new boiler had also been erected, and had been connected. These pipes, leading from the boiler room to the new engine room, extended along the ceiling, the pipe being several inches lower where it reached the new engine room than near the boiler room. Four feet and three inches from the end of the main pipe in the engine room, a smaller lateral pipe extended from it to the engine; there being a valve, which was closed, in the lateral pipe at its junction with the main pipe. At the end of the main pipe a six-inch tee was attached, with a two-inch bushing, from which a two-inch pipe extended at right angles to the driers for the purpose of adding live steam to the exhaust steam used in drying the paper. From the driers another pipe extended back to the boilers, designed to return the condensed steam. In the two-inch pipe, and about 10 inches from the tee, there was a valve, by means of which the steam could be shut off or permitted to pass through. This line of piping was put in place on Sunday, December 4, 1898. On Monday, the 5th, the valve in the two-inch pipe, as well as the valve in the lateral pipe extending to the new engine, being closed, steam was turned on for the purpose of testing the pipes. At the connection of the lateral pipe leading to the new engine, a leak was discovered. To relieve this, the valve in the two-inch pipe near the tee was opened slightly by O'Connor, a machinist and millwright in defendant's employ, thus allowing the water that had accumulated in the main pipe from the condensation of steam to pass off. On Tuesday, the 6th, the steam was continued in the new pipes as before; and on Wednesday morning the superintendent, observing that the leak or drip still continued at the connection of the lateral pipe running to the engine with the main pipe at the ceiling, slightly opened the valve in the two-inch pipe near the tee, as before, for the purpose of draining off the water. Later in the morning the decedent came into the new engine room to make an inquiry of the superintendent, who was there. About this time the superintendent again opened the same valve slightly, when a pounding noise, known as "steam hammer," was heard in the main pipe. The superintendent then closed the valve, the steam hammer continued, and within from one to three minutes the tee burst, and steam was emitted in such quantity as to cause the death of the decedent. The main steam pipe was a few inches lower at the valve opening into the lateral pipe leading to the new engine than at the tee. It was claimed by the plaintiff that defendant was guilty of negligence in not providing a drip or bleeder for drawing off the water that might condense in the main pipe, and that provision should have been thus made for draining the pipe at its lowest point. If the valve in the pipe leading to the new engine had been opened, that being the lowest point in the main pipe, it probably would have drawn off the water, although this was not shown definitely. The superintendent intended to place a drip or bleeder in the main pipe at the point where the lateral pipe branched off to the engine, but this had not been done at the time of the accident. Evidence was given tending to show that it was customary to insert a drip or bleeder in such steam pipes. The tee that split or burst was of good material. Plaintiff contended

that the water hammer was caused by the act of the superintendent in opening
the valve, and evidence was introduced tending to show that as an opening
is made to draw off the water, and as the water commences to move, the
steam condenses, and a vacuum is created, which pulls the water back towards
the steam, and the whole body of water in the pipe is set in motion, waving
back and forth, causing a series of blows. It is claimed that this ultimately
burst or split the tee. It was cold weather, and under such circumstances it
was claimed that the live steam being forced into this large pipe, which was
at some points eight and others ten inches in diameter, would condense rapidly,
forming considerable water, which, on account of the pipe being lower at and
near the end, would accumulate there. The plaintiff also claimed that defend-
ant was guilty of negligence in admitting live steam into these pipes at a
time when no provision for drainage had been made, and in opening the valve
at a time when the superintendent should have known that the pipe contained
a large quantity of water, and that the act of the superintendent in thus
opening the valve was the act of the defendant. At the close of plaintiff's case,
defendant's counsel moved for a nonsuit on the grounds (1) that plaintiff failed
to make out a cause of action; (2) that there was no proof of negligence on the
part of defendant; (3) that defendant fully discharged its duty; (4) that de-
fendant is not liable for error of judgment, but only for culpable negligence,
which was not shown; (5) that defendant was not obliged to foresee and guard
against such an accident; (6) that the plant was incomplete, and the decedent
assumed the risk; (7) that the act of the superintendent was a detail of the
work, and not the act of defendant; (8) that, notwithstanding the absence
of a drip cock or bleeder, it did not appear but that the pipe could have been
drained through the exhaust or through the pipe to the engine. The motion
was denied, and defendant excepted. The court left it to the jury to determine
whether the defendant had discharged its duty of providing for plaintiff's in-
testate a safe place in which to do his work, and whether defendant was negli-
gent and did anything that was a direct and proximate cause of the injury.
The court also left it to the jury to say whether or not the superintendent, in
turning the valve, was the co-servant of the decedent, and declined the request
of defendant's counsel to charge, as matter of law, that he was such co-servant,
to which ruling defendant's counsel duly excepted. Defendant's counsel also
requested the court to charge, as matter of law, that the superintendent, in
turning the valve, was performing a detail of the work, and did not stand in
place of the master. This the court declined, and defendant's counsel duly
excepted.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-
LIAMS, and LAUGHLIN, JJ.

Watson M. Rogers, for appellant.
Henry Purcell, for respondent.

LAUGHLIN, J. It is evident that the jury were given to under-
stand that even if they found that defendant was not guilty of negli-
gence with reference to the manner in which the plant was construct-
ed, or in not having previously provided a drip cock or bleeder for the
main steam pipe, still if the jury found that the superintendent,
in turning the valve, was not acting as a co-servant with decedent, and
if his act in turning the valve was the sole cause of the injury, defend-
ant would be liable. This we think was error. In effect, the jury
were permitted to find against the defendant even if they believed from
the evidence that defendant had discharged its duty of furnishing the
decedent a reasonably safe place in which to perform his duties. If
the place was safe, and was made dangerous only by the act of the
superintendent in opening the valve, plaintiff was entitled to recover,
under this charge, provided the jury were of opinion that the superin-

tendent, in opening the valve, represented the master. The legal proposition thus presented is whether the superintendent, while testing machinery or appliances, so represents the master as to make the latter liable to another employé injured directly and immediately by the superintendent's negligent act. It is, of course, well settled that it is the duty of a master to furnish reasonably safe tools, machinery, and appliances to his servants, and to inspect the same from time to time. The person furnishing the tools, machinery, and appliances, and the employé who inspects the same, in so doing perform a duty which devolves upon the master, and for their negligence the master is liable to a servant to whom the tool, machinery, or appliance is subsequently delivered for use, and who, owing to such negligence, is subsequently injured thereby. It is also the duty of the master to exercise reasonable care to furnish a safe place for his employés to work, and whoever furnishes the completed place represents the master. We are not, however, prepared to hold that the master is liable for the negligent act of a foreman or superintendent in inspecting or repairing machinery, tools, or appliances, or in the work of making a place safe for his employés, where such negligent act results in direct, immediate injury to another servant while the work of inspection or repairing or making the place safe is in progress. We are of opinion that the act of the superintendent in opening this valve was the act of a coservant, and not of the defendant, and, as the evidence is undisputed, the jury should have been so instructed as matter of law. Murphy v. Railroad Co., 88 N. Y. 146; Bell v. Power Co., 36 App. Div. 243, 56 N. Y. Supp. 780; McCosker v. Railroad Co., 84 N. Y. 77; Cullen v. Norton, 126 N. Y. 1, 26 N. E. 905; Beilfus v. Railroad Co., 29 Hun, 556; Hussey v. Coger, 112 N. Y. 614, 20 N. E. 556, 3 L. R. A. 559; Kimmer v. Weber, 151 N. Y. 419, 45 N. E. 860; Vitto v. Keogan, 15 App. Div. 329, 44 N. Y. Supp. 1; Crispin v. Babbitt, 81 N. Y. 516. It does not, however, follow that plaintiff cannot recover. If the master was negligent in not furnishing a reasonably safe place or in constructing the plant negligently, and such negligence co-operated with negligence of the superintendent in turning the valve, the master would be liable. These exceptions present reversible errors and require a new trial, with costs to appellant to abide the event.

ADAMS, P. J., concurs. McLENNAN and WILLIAMS, JJ., concur in result. SPRING, J., dissents.

Judgment and order reversed, and new trial ordered, with costs to appellant to abide event.